# CHARLESTON

GARRETTSON & CO. v. RINEHART & DENNIS CO.

Submitted February 3, 1915.    Decided February 23, 1915.

1. CONTRACTS—*Construction Contract—Alternative Rights of Contractor—Election.*

     A contractor having the alternative right, under his sub-contract, in case of default in the prosecution of the work thereunder, to take full and complete possession of the work and the sub-contractor's tools and machinery and use the latter in the completion of the work, at the expense of the sub-contractor, after having given notice in writing of his intention so to do, or to put on additional men, leaving the work in the hands of his sub-contractor, does not exercise the former right by the mere putting on of additional men, slight alteration of the method of work, without objection from the sub-contractor, and payment of their wages directly to the men after having previously found it necessary to guarantee their wages by reason of delay in payment by the sub-contractor, at the same time requesting co-operation on the part of the sub-contractor. His procedure is the exercise of the latter right, notwithstanding a reference to the other in a telegram giving notice thereof.    (p. 706).

2. SAME—*Construction Contract—Abandonment by Sub-Contractor—Completion by Contractor.*

     Abandonment of the work by the sub-contractor, after such procedure, authorizes the principal contractor to take full possession of the work, machinery, tools and appliances and use the latter in the completion of the work, for and on account of the sub-contractor, crediting him with the contract prices of the work, as it is performed, and charging him with the cost thereof. Such use of his machinery and appliances is not a conversion thereof.    (p. 706).

3. BAILMENT—*Construction Contract—Rental of Appliances—Warranty—Repairs.*

     In an agreement between a contractor and his sub-contractor, for the rental by the former to the latter, of machinery and appliances already on the ground at the date of the contract, for use in execution of the work sub-let, there is no implied warranty of the fitness

of the machinery for such work, nor any implied undertaking on the part of the principal contractor to repair defects therein.  (p. 708).

Error to Circuit Court, McDowell County.

Action by E. L. Garrettson & Co. against the Rinehart & Dennis Company.  Judgment for defendant, and plaintiffs bring error.

*Affirmed and remanded.*

*Walton O. Bowers,* and *Anderson, Strother & Hughes,* for plaintiffs in error.

*Stokes & Sale,* for defendant in error.

POFFENBARGER, JUDGE:

The loss of a verdict for $15,000.00 found and returned, as damages for an alleged breach of a contract for railroad construction work, and the award of a new trial constitute the complaint on this writ of error.

Having obtained a contract from the Norfolk and Western Railway Company for the grading, masonry and tunnel and trestlework required for its road bed between certain mile posts at Vivian, West Virginia, covering a distance of 2.70 miles, the Rinehart & Dennis Company, a corporation, sublet the work to E. L. Garrettson and Company, after having performed a portion of it.  It consisted principally of bridge and tunnel work.  The tunnel was something like six or seven hundred feet long and the principal contractor reserved to itself the work of driving it through the hill.  The sub-contract included all of the concrete work to be done, the completion of the bridge work, the tunnel portals and tunnel lining, consisting, for the most part of excavation and concrete work. The sub-contractors obligated themselves to complete the work by September 1, 1911, and commence it within ten days after the date of the contract, Feb. 18, 1911.  In so far as they were applicable to the work sub-let, the sub-contractors assumed or undertook all of the contractor's responsibility and obligations to the company, as set forth in the principal contract, and the contractor expressly reserved all of the powers and rights against the sub-contractors, which the company held against it.  In other words, the contract between

the company and the principal contractor was adopted as the contract between the contractor and the sub-contractors, in so far as it was applicable and not inconsistent with the terms of the sub-contract. The sub-contractors were to have specified prices for the work, somewhat less than those agreed to be paid by the company to the principal contractor, and 85 per cent of the amount agreed upon was to be paid to the sub-contractors on or about the 20th of the month following that in which the work was done, the residue being deducted and held until completion of the work. The sub-contract further provided for the use by the sub-contractors of the masonry plant of the contractor, then on the work, for which they were to pay $400.00 per month, as rental, one-half to be deducted as a charge against the corresponding monthly estimate and the balance charged against the final estimate.

Clause C of the contract with the railway company provided that in case of violations of the contract, the chief engineer might, after ten days notice in writing, setting forth the particular breaches thereof and served on the contractor, either in person or mailed to its address last given by it to the company, or by posting the same at the door of its office on or near the work, proceed as follows: "require the Contractor to at once supply such increase of force, appliances or tools, and to cause to be made such improvement in the character of the work and materials as may be required, in the opinion of the Chief Engineer, to make the same conform to the stipulations of this agreement and the specifications; and if, on the expiration of ten days after such service of writing, the Contractor shall have failed to furnish to the Company evidence satisfactory to the Chief Engineer of the intention and ability of the Contractor to furnish the desired improvements and remedy the specified deficiencies, the said Company may thereupon enter on and take possession of said work, or any part thereof, with the tools, materials, plant, appliances, houses, machinery, or other appurtenances thereon, and hold the *same as security* for any or all damages or liabilities that may arise by reason of the non-fulfillment of this agreement within the time herein stipulated; and furthermore, may employ the said tools, materials, etc., as aforesaid, and such other means as the Company may deem proper to complete

the work, at the expense of the said Contractor, and may deduct the cost of completing the entire work from any payments then due or thereafter falling due to the said Contractor, and recover from him any and all deficiency."

Having commenced the work at the time specified for commencement thereof, or soon afterwards, Garrettson and Co. continued in the performance thereof until some time in October 1911, but their progress was unsatisfactory. The Rinehart and Dennis Company did not complete the driving of the tunnel, until some time in July 1911, in consequence whereof the tunnel work to be done by Garrettson and Co. may have been delayed. From February until August, they were engaged in what is known as out side work, bridge work and other similar construction. After the work in the tunnel was started in July or August, the inspecting engineers of the railway company ascertained that the progress thereof was too slow, and complained to Rinehart and Dennis Company, that the force on the work was insufficient. Having been notified in April, 1911, that the tunnel had not been started, the chief engineer of the railway company notified Rinehart & Dennis Co., by letter dated, April 28, that he desired the tunnel entirely finished in October, and he observed, in the summer, that the concreting was not progressing as it should. He was on the ground in August and made a vigorous complaint. As early as June 1, 1911, Rinehart registered a complaint about the progress of the work with the plaintiffs. On July 29, 1911, they were advised of the paucity of the work done in the tunnel and the necessity of completing it on time. They were told it might be possible to get an extension of thirty days, but also that the work must not drag along and that inability to get help was no legal excuse for delay. By a letter dated August 5th they were reminded of the nonfulfillment of their promise to put on more men, and admonished that the work must be completed before freezing weather and that they must show such progress, within the next few weeks, as would insure its completion. On August 14, 1911, this telegram was sent: "Chief Engineer complaining about your progress. Something must be done at once. Wire answer so we can make reply to him." On the same day, they answered thus: "We have placed a night force on our work

and expect to finish side walls this month also erecting centers in position to concrete every day until work is finished.'' In a telegram dated, October 2nd, Rinehart and Dennis Co. requested permission of the Chief Engineer, to do the concrete work in day time only. To this, he replied as follows: ''Necessary that you carry out the schedule laid down and put on night force on tunnel work. This work must be finished before freezing weather.''

About September 20th, plaintiffs had trouble with their men by reason of their failure to pay them at that time, and the defendant had to guarantee their wages. As to the cause of said failure, there is some controversy in the evidence. Early in October, the Rinehart and Dennis Co. put on a night force. Whether the men were employed by them or by Garrettson and Co. is not material. The work was still unsatisfactory. Garrettson seems to have given it but little direct personal attention. He left it largely to his bookkeeper and foreman. The Rinehart and Dennis Co. did not remit the amount of money necessary to meet the October pay-roll. Instead of sending it to Garrettson and Co., it sent it to one Perkins, its own superintendent, and wired Garrettson and Co. as follows: ''On acount of condition of your work and our liability for pay-roll etc., we are exercising our rights under clause C of contract and your pay-roll money will be sent today to Perkins. Will be glad to have you cooperate with him. See letter.''

The effort of Perkins, representing the defendant, to put on the night force met with some resistance. Plaintiffs sent their attorney on the ground, in resistance thereof, but he seems to have been convinced of the right of the contractor to put it on and yielded. At or about the time this force was put on, Perkins found fault with the appliances used by Garrettson and Co. in the lining of the arch of the tunnel and expressed intention to adopt a different method. Owing to the friction thus engendered, Garrettson and Company's bookkeeper sent in his resignation, on the 14 of Oct. to take effect on the 25th. Some time between the 15th and the 20th of October, Perkins made the alterations. When the money necessary for the pay-roll, mentioned in the telegram quoted from, was received by Perkins, he had Patterson, plaintiffs'

bookkeeper, pay their employees, but not from their office. They were paid at the office of the defendant. All of these transactions were reported to Garrettson at Cincinnati, Ohio, by Patterson.

In the opinion of all who have testified on the subject, including Garrettson and Company's foreman, the altered appliances effected economy in the work and facilitated its progress. Under the Garrettson plan, the concrete was put in buckets on a narrow-guage car, pushed into the tunnel by a small engine, from which they were lifted by a derrick to a moveable platform about eighteen inches above what is called the springing line of the arch, but eight or nine feet below the top of the arch, where they were emptied. From this platform, the concrete was shoveled to another higher up, and then into the forms. Perkins took this arrangement out and substituted railroad cars with high platforms on them, on which the concrete was loaded outside of the tunnel. From these platforms the concrete was immediately placed in the forms. The advantage of the new arrangement was the saving of a good deal of time and labor in the handling of the concrete. The cost of tearing out the old platform was a small matter of twenty-five or fifty dollars and that of the platforms on the railroad cars about one hundred dollars.

Garrettson and Co's. bookkeeper, left the work on the 26th day of October, and Malarky, their foreman, on November 24th. Garrettson himself seems never to have gone about the work after these controversies arose. The machinery, tools and appliances of the plaintiffs were used by the defendant, and the cost of repairs thereof charged to them; and, on the completion of the work, such of them as had not been worn out or sold to satisfy claims of creditors were left there. A hoisting engine belonging to Garrettson and Company which had cost originally $1800.00 was sold under an attachment proceeding at the instance of creditors, and purchased by Perkins for his company at the price of $240.00. The work was completed and the Rinehart and Dennis Co., left the premises, January 1, 1912.

Upon the theory of wrongful seizure of the machinery, tools and appliances by the defendant and conversion thereof to its own use, based upon its alleged assumption of charge of

the work, without having given the notice required by clause C of the contract, the plaintiff sued for the value of said property, placing it at more than $10,000.00. The remaining items of the bill of particulars are $1,185.00, the cost of repairs to the rented machinery; $4,790.00, a 15% deduction from an estimate; and, $8,000.00, loss of estimated profits on the work.

The first claim is predicated upon the telegram of October 23rd 1911, the withholding of the pay-roll for October, distribution thereof to the men from the office of the defendant, the alteration made in the appliances and the alleged exclusion of the plaintiff from the work. The right of the defendant company to take charge of the work and exclude the plaintiff, after having given the notice prescribed in the contract and referred to in clause C, is conceded, but no such formal notice was given. Therefore, it is urged seizure of the property of the plaintiff used in the work was wrongful and amounted to a conversion thereof to the use of the defendant.

Another clause of the contract provides that, in the event of failure or refusal of the contractor to prosecute the work with a force sufficient, in the judgment of the chief engineer, for its completion within the time prescribed, the company may proceed to employ such a number of workmen, laborers and overseers, as, in the opinion of the chief engineer, is necessary to insure such completion at such wages as the company may find necessary or expedient, and pay all persons so employed, and charge the amounts so paid, as so much money paid to the contractor under the contract. An important question is whether this provision is a part of clause C or an independent one. That clause contemplates a complete and absolute ouster of the contractor from the work and premises. It is immediately followed by a paragraph which says all rights of occupancy in or upon any lands or property of the company and all rights of the contractor, or any person claiming under or through it, to any further prosecution of or interest in the work, shall cease and determine, and the company may take possession of such land and property, and complete the work thereon in such manner as it may think best. This paragraph is followed by the clause authorizing the employment of additional men and overseers. It does not

contemplate a complete ouster, but only the furnishing of additional men whom the contractor must accept. In view of this great difference, we are clearly of the opinion that the provision for additional men is not a part of clause C.

Although the telegram of October 23rd, repeated in the letter of confirmation bearing the same date, purported to be notice of the exercise of the right of the contractor under clause C of the contract, it did not give any notice of intent to exclude the sub-contractors from the work. On the contrary, it expressed a desire for their assistance and gave an invitation to them to co-operate with Perkins, as did also the letter of confirmation. Nor, in point of fact, were the sub-contractors excluded or ousted. Perkins recognized the book-keeper and foreman as being still in control. Such of their men as would stay seem to have been retained, and none of them were discharged. None of them except Carpenter and Marlarky seem to have left. In view of the magnitude of the work, a $70,000.00 undertaking, the alterations in the appliances were relatively slight and unimportant, as well as highly beneficial to the sub-contractors in point of economy and facilitation of the work. Inquiry as to the effect and purpose of direct payment of the October pay-roll to the men involves consideration of the contract in the light of the lien given by law to laborers on railroads for their wages. In all cases of non-payment of the contractor of money due the laborers or other workmen for work performed, the company was expressly authorized to pay them, and the sub-contract makes this provision operative between the contractor and the sub-contractors. As to the October pay-roll the sub-contractors were not in fault. They could not pay it until they received the amount due on their estimate for the month of September. Failure to meet the September pay-roll on time had necesitated a guaranty of the wages of the men by the contractor. This circumstance no doubt was a cause of the action taken respecting the October pay-roll. That action did not signify assumption of complete control of the work and exclusion of the sub-contractors therefrom, within the meaning of clause C. The inference that might arise from the circumstance is clearly negatived by the telegram and letter of confirmation, as well as by the contractor's recognition of the bookkeeper and the foreman of

the sub-contractor. Each of them was retained until he voluntarily left. Moreover, Garrettson did not know what was meant by the reference to clause C in the telegram at the time he received it. After these transactions, the foreman went to Cincinnati and consulted Garrettson, and was told by him to stay on the work.

Neither the telegram nor the contemporaneous and subsequent conduct of the contractor discloses intent to take over the work and exclude the sub-contractor therefrom, within the meaning of clause C of the contract. Our conclusion, therefore, as a matter of law, is that the procedure of the contractor was under the independent clause, conferring right to put on additional men and overseers, and that the sub-contractors after the action taken in October wholly abandoned their contract and so impliedly surrendered possession of the work, machinery, tools and appliances to the contractor, and authorized it to take possession and continue the use of the property for completion of the work. Technically stated, our opinion is that the evidence is insufficient to sustain a finding of conversion of the property to the use of the defendant. From the conclusion, it follows that the contractor is liable, if at all, only for such injuries as were wrongfully inflicted upon the property in the use thereof, in completing the work, or resulted from failure to take precaution for its preservation and safety on the premises, after the completion thereof.

Whether a technical violation of the contract on the part of the defendant, such as is claimed, would make it liable as for conversion of the property, is not decided, decision of the question being unnecessary.

Liability for the second item of the bill of particulars is precluded by the terms of the contract which neither guarantee the fitness or suitableness of the rented machinery, nor obligate the contractor to put the same in repair. It reads as follows: "The contractor agrees to turn over to the sub-contractor all of the contractors masonry plant now on the work and permit the use of the said plant by the Subcontractor for his operations under the agreement for a rental at the rate of $400.00 per calendar month, one half of said rental to be deducted as a charge against the *corresponding*

monthly estimate, and the balance of said rental to be deducted as a charge against the final estimate." This clause must be read in connection with all the other provisions of the contract, and so read its interpretation is clear. The rental of the machinery shows the defendant was not to furnish it at its own expense. Plaintiffs undertook the work and were to furnish the machinery. It appears from the oral testimony that Garrettson had spent a day on the work and inspected the machinery, some of which was then running so he could see whether it was sufficient or not. Having done so, he knew exactly what he was getting. Under such circumstances, there is no implied warranty, and an express one cannot be engrafted upon the written agreement by resort to parol evidence. *Erie Iron Works* v. *Miller Supply Co.*, 68 W. Va. 519; *Griffin* v. *Runnion*, 82 S. E. 686.

For the third item of the bill of particulars, there is no foundation whatever in the evidence. The final estimate of the work includes all of it and amounts to $71,738.65. From that, there is no fifteen per cent. deduction. Nothing is taken from it except the credits previously given, represented by the net estimate for the month of December 1911, $60,758.04, leaving a difference of $10,980.31, which was placed to the credit of the plaintiffs in the statement showing a balance of over $5,000.00 due from them. Though it does not admit non-payment of any retained percentage, justifying a verdict therefor, the statement is incomplete and somewhat contradictory. The defendant may not have paid and credited all that is due, but it is impossible to say, from the evidence adduced, whether anything is due the plaintiffs for work done under the contract or not. The final estimate shows $71,738.65, but the summary of the statement credits only $50,194.20. Deductions made from the gross amount, in striking balances, may account for this apparent discrepancy, and it may be cleared up on the new trial.

These conclusions settle substantially all of the legal questions fairly raised on the writ of error and fully sustain the action of the court in setting aside the verdict and awarding a new trial; wherefore the judgment complained of will be affirmed and the case remanded.

*Affirmed and remanded.*